LITTLE ROCK FAMILY PLANNING SERVICES, P.A.; Curtis E. Stover, M.D.; Fayetteville Women's Clinic; and Tom Tvedten, M.D., on behalf of themselves and the Medicaid-eligible women of the state of Arkansas to whom they provide health care, Plaintiffs,

v.

Thomas DALTON, Director of the Arkansas Department of Human Services, in his official capacity, Kenny Whitlock, Deputy Director of the Arkansas Division of Economic and Medical Services, in his official capacity, and Jim Guy Tucker, Governor of the State of Arkansas, in his official capacity, and their successors, Defendants.

No. LR–C–93–803.

United States District Court,
E.D. Arkansas,
Little Rock Division.

July 25, 1994.

Bettina Brownstein of Wright, Lindsey & Jennings, Little Rock, AR, and Eve C. Gartner, Kathryn Kolbert, and Terri James of The Center for Reproductive Law & Policy in New York City, for plaintiffs.

Debby Thetford Nye, Ann Purvis and Jeffrey A. Bell of the office of the Arkansas Atty. Gen., Winston Bryant, Little Rock, AR, for defendants.

### MEMORANDUM OPINION AND ORDER

WILSON, District Judge.

Plaintiffs have filed a motion for summary judgment in a civil action for injunctive and declaratory relief under the Supremacy Clause of the United States Constitution, Article VI, Clause 2. Little Rock Family Planning Services and the other plaintiffs seek to have this Court declare invalid and enjoin enforcement of Amendment 68 to the Arkansas Constitution, alleging that it is in conflict with applicable federal law—the 1994 Hyde Amendment. Amendment 68 states that "No public funds will be used to pay for any abortion, except to save the mother's life." Under the Hyde Amendment that was signed into law on October 21, 1993, federal law requires Arkansas and other states that participate in the federal Medicaid program to pay for abortions in cases where pregnancy is the result of rape or incest, as well as abortions to save the mother's life. Plaintiffs argue that Amendment 68 is inconsistent with the Hyde Amendment and is thus preempted by federal law and void. Plaintiffs are correct, and the motion for summary judgment will be granted, for the reasons discussed below.

### SUMMARY JUDGMENT

Summary judgment is appropriate only when there is no genuine issue of material fact, so that the dispute may be decided solely on legal grounds. *Holloway v. Lockhart,* 813 F.2d 874 (8th Cir.1987); Fed. R.Civ.P. 56. The Supreme Court has established guidelines to assist trial courts in determining whether this standard has been met:

> The inquiry performed is the threshold inquiry of determining whether there is a need for trial—whether, in other words, there are genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The Eighth Circuit has set out the burdens of the parties in connection with a summary judgment motion in *Counts v. MK–Ferguson Co.,* 862 F.2d 1338 (8th Cir.1988):

> The burden on the party moving for summary judgment is only to demonstrate, i.e., 'to point out to the District Court,' that the record does not disclose a genuine dispute on a material fact. It is enough for the movant to bring up the fact that the record does not contain such an issue and to identify that part of the record which bears out his assertion. Once this is done, his burden is discharged, and if the record in fact bears out the claim that no genuine dispute exists on any material fact, it is then the respondent's burden to set forth affirmative evidence, specific facts, showing that there is a genuine dispute on that issue. If the respondent fails to carry that burden, summary judgment should be granted. *Id.* at 1339 (quoting *City of Mt. Pleasant v. Associated Elec. Coop.,* 838 F.2d 268, 273–274 (8th Cir.1988).

Rule 56(c) of the Federal Rules of Civil Procedure states that summary judgment shall be rendered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The Supreme Court has emphasized that Rule 56 must be construed with due regard not only for the rights of people asserting claims and defenses "that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the rule, prior to trial, that the claims and defenses have no factual basis." *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

## PROCEDURAL AND FACTUAL BACKGROUND

The Court asked both parties if they desired a hearing on this matter—both responded that there are no material factual issues, and that there is no need for a hearing. The Court finds that there are no genuine issues of material fact. Since neither party requested oral arguments, the Court will decide the case based on the extensive discussion of the legal issues in the parties' pleadings and briefs.

Little Rock Family Planning Services is a provider under the Medicaid program and operates a women's health care facility providing reproductive health care services, including abortions, to Medicaid-eligible women in Arkansas. The state reimburses it for medical services, except for abortions that are not performed to save the mother's life. Some of the facility's patients are Medicaid-eligible women who seek to terminate pregnancies that are the result of rape or incest.[1] The facility's Medical Director is plaintiff Curtis Stover, M.D., a licensed physician who provides medical services including abortions to Medicaid-eligible women, some of whom are pregnant as a result of rape or incest. Little Rock Family Planning Services and

Dr. Stover sue on their own behalf and on behalf of the Medicaid-eligible women for whom they provide health care services. Plaintiffs Fayetteville Women's Clinic and Dr. Tom Tvedten, M.D., provide services similar to those provided by Little Rock Family Planning Services and Dr. Stover.

Defendant Thomas Dalton is Director of the Arkansas Department of Human Services (DHS), the agency that administers public assistance in Arkansas. Kenny Whitlock is Deputy Director of DHS for the Division of Economic and Medical Services, which implements the state medical assistance program. The Governor is a defendant in his official capacity in enforcing state law.

## CASE OR CONTROVERSY REQUIREMENT

Defendants allege that the complaint does not meet the requirements of the Article III case or controversy requirement, arguing that plaintiffs lack standing, and also that the case is premature under the ripeness doctrine. Standing is a threshold issue in every case before a federal court, determining the power of the court to entertain the suit. *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). A federal court's jurisdiction can be invoked only when the plaintiff has suffered "some threatened or actual injury resulting from the putatively illegal action." *Linda R.S. v. Richard D.,* 410 U.S. 614, 617, 93 S.Ct. 1146, 1148, 35 L.Ed.2d 536 (1973). The Supreme Court defined the constitutional requirements of standing in *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984): "A plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." Defendants contend that plaintiffs have "failed to present any situation in which they have incurred a direct and concrete injury."

---

1. About 16,000 women in the United States become pregnant annually because of rape or incest. Regarding eligibility to receive Medicaid benefits for all purposes, there were about 35,700 women in Arkansas in 1985 from the ages of 15 to 44 who were eligible. Torres, Donovan, Dittes, and Forrest, *Public Benefits and Costs of Government Funding for Abortion,* Vol. 18, No. 3,

Fam. Plan. Persp. 111 (May/June 1986). A staff report of the U.S. Senate Judiciary Committee indicated that most experts believe that between one in five and one in eight women in the United States are raped at some point in their lives. *Violence Against Women: A Week in the Life of America,* Report by the Majority Staff of the U.S. Senate Judiciary Committee (October, 1992) at 2.

(Defendants' response to summary judgment motion, at 15).

It is clear that there is an actual controversy in this case. In *Doe v. Bolton*, 410 U.S. 179, 188–189, 93 S.Ct. 739, 745–746, 35 L.Ed.2d 201 (1973) and *Singleton v. Wulff*, 428 U.S. 106, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976), the Supreme Court held that physicians have standing to assert the rights of their patients. The Court in *Singleton* found that the physicians had suffered concrete injury from a Missouri statute that excluded abortions that are not "medically indicated" from the purposes for which Medicaid benefits are available to needy persons. *Singleton*, at 106, 96 S.Ct. at 2870. The physician-plaintiffs alleged a sufficiently concrete interest in the outcome of their suit to make it a "case or controversy" under Article III, for they "have performed and will continue to perform operations for which they would be reimbursed under the Medicaid program, were it not for the limitation of reimbursable abortions to those that are 'medically indicated.' If the physicians prevail in their suit to remove this limitation, they will benefit, for they will then receive payment for the abortions. The State (and Federal Government) will be out of pocket by the amount of the payments." *Id.* On the standing matter as to whether the physicians were proper proponents of the particular legal rights at issue, Justice Blackmun stated:

A woman cannot safely secure an abortion without a physician's aid, and an impecunious woman cannot easily secure an abortion without the physician's being paid by the State. Aside from the woman herself, the physician is uniquely qualified, by virtue of his confidential, professional relationship with her, to litigate the constitutionality of the State's interference with, or discrimination against, the abortion decision. Moreover, there are obstacles to the woman's assertion of her own rights, in that the desire to protect her privacy may

deter her from herself bringing suit, and her claim will soon become at least technically moot if her indigency forces her to forgo the abortion. *Singleton*, at 111–118, 96 S.Ct. at 2873–2876.

 Although the facts and state statute involved in *Singleton* were not identical to those in *Little Rock Family Planning Services v. Dalton*, the standing of physicians to assert the rights of their patients is beyond debate. Pursuant to *Singleton* and other cases finding standing of physicians in this type of controversy, it is clear that plaintiffs have standing in the case at bar. Any doubts about standing are removed by the facts that the plaintiffs have provided and will continue to provide abortions to "Arkansas Medicaid-eligible patients who are pregnant due to an act of rape or incest." (Declaration of Carolyn Izard, Jan. 24, 1994, at 1; Declaration of Curtis Stover, M.D.; Declaration of William Harrison, M.D.; Affidavit of Tom Tvedten, M.D.).[2]

 Plaintiffs do not have to await possible legal action by the Health Care Financing Administration (HCFA) before seeking judicial relief. As the Supreme Court held in *Rosado v. Wyman*, 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970) it is "peculiarly part of the duty of this tribunal, no less in the welfare field than in other areas of the law, to resolve disputes as to whether federal funds allocated to the States are being expended in consonance with the conditions that Congress has attached to their use." *Rosado*, at 423, 90 S.Ct. at 1223. Under a substantial line of cases that will be discussed later in this Order, Arkansas' obligation to cover abortions for women pregnant as a result of rape or incest began when the 1994 Hyde Amendment became effective in October, 1993. *See, e.g., Roe v. Casey*, 623 F.2d 829 (3d Cir.1980); *Zbaraz v. Quern*, 596 F.2d 196 (7th Cir.1979), *cert. denied*, 448 U.S. 907, 100 S.Ct. 3048, 65 L.Ed.2d 1136 (1980); and *Hodgson v. Board of County Commissioners*,

**2.** It is also clear that the class of plaintiffs who are "Medicaid-eligible women" to whom the other plaintiffs provide health care also have standing. *Roe v. Wade*, 410 U.S. 113, 124, 93 S.Ct. 705, 712, 35 L.Ed.2d 147 (1973). The Court ruled that when pregnancy "is a significant fact in the litigation ... [it] will come to term before the usual appellate process is complete. If that termination makes a case moot, pregnancy litigation seldom will survive much beyond the trial stage, and appellate review will be effectively denied. Our law should not be that rigid ... Therefore, Jane Roe had standing."

*County of Hennepin,* 614 F.2d 601 (8th Cir. 1980). Defendants have devoted considerable argument in this case to administrative law issues regarding certain HFCA directives to state Medicaid directors, and they contend that the case is not ripe, based upon these administrative law questions. These arguments are misplaced, for there is no pending administrative action in this case, which is determined by strictly legal issues related to the *Roe v. Casey* line of cases cited above and other decisions dealing with Title XIX of the Social Security Act and the Hyde Amendment. As will be discussed in this Order, defendants failed to either distinguish these federal court decisions or show that they were wrongly decided. There is no reason to reach the administrative law questions discussed by the parties. The central issue in this case is whether there is a conflict between Arkansas Amendment 68 and the 1994 Hyde Amendment. The matter of this Court's jurisdiction is determined by the facts that plaintiffs have performed and will continue to perform abortions for which they would be reimbursed under the Medicaid program were it not for Amendment 68. Amendment 68 causes plaintiffs direct injury when they must either turn away or pay the costs for Medicaid-eligible survivors of rape and incest who need abortions; hence the plaintiffs' claim is ripe for review.

## MEDICAID AND THE HYDE AMENDMENT

Title XIX of the Social Security Act of 1965, 42 U.S.C. § 1396, established the federal Medicaid program. The opening section of the statute authorizes an appropriation for each fiscal year and sets forth a basic statement of purpose: the act is to enable "each State, as far as practicable under the conditions in such state, to furnish medical assistance on behalf of ... [those] whose income and resources are insufficient to meet the costs of necessary medical services." 42 U.S.C. § 1396; *Beal v. Doe,* 432 U.S. 438, 444, 97 S.Ct. 2366, 2370, 53 L.Ed.2d 464 (1977). The Eighth Circuit has ruled that "Title XIX of the Social Security Act, commonly known as the Medicaid Act, is a federal-state cooperative program designed to provide medical assistance to persons whose income and resources are insufficient to meet the costs of medical care. Although a state's participation is voluntary, once a state chooses to participate in the program it must comply with federal statutory and regulatory requirements." *Weaver v. Reagen,* 886 F.2d 194, 196 (8th Cir.1989); citing *Alexander v. Choate,* 469 U.S. 287, 289 n. 1, 105 S.Ct. 712, 714 n. 1, 83 L.Ed.2d 661 (1985).

States choosing to participate in the Medicaid program may elect to provide medical services either to the "categorically needy" only, or to both the "categorically needy" and the "medically needy." 42 U.S.C. § 1396a(a)(10)(A) and 42 U.S.C. § 1396a(a)(10)(C). The "categorically needy" are those who receive financial aid from certain specified federal aid programs; the "medically needy" are those who do not qualify for some forms of federal assistance but who nonetheless lack the resources to obtain adequate medical care. *Preterm, Inc. v. Dukakis,* 591 F.2d 121, 124 (1st Cir.1979) *cert. denied,* 441 U.S. 952, 99 S.Ct. 2181, 2182, 60 L.Ed.2d 1057 (1979); *Hodgson v. Board of County Commissioners, County of Hennepin,* 614 F.2d 601, 606 (8th Cir.1980). Arkansas provides services to both the categorically needy and the medically needy. 20 A.C.A. 77. Participating states must adopt a Medicaid plan explaining the state's eligibility requirements and the services that will be funded; the plan must gain approval from the federal government. Defendants state that "within the State plan there are state assurances of full compliance with federal law and regulations." 42 C.F.R. § 430.10. The state must "include reasonable standards ... for determining eligibility for and the extent of medical assistance under the plan which ... are consistent with the objectives of Title XIX." *Hodgson,* supra, at 607. Under Title XIX, certain categories of medical care are mandatory and must be provided by every state Medicaid program, while certain other categories are optional and coverage is at the state's discretion: the mandatory categories include "(1) inpatient hospital services, (2) outpatient hospital services, (3) other laboratory and x-ray services, (4) skilled nursing facilities, [early and periodic screening, diagnostic and treatment services,

or 'ESPDT'] for persons under the age of 21 and family planning services and supplies, and (5) physicians' services." *Preterm,* supra, at 124; 42 U.S.C. § 1396d(a). Abortion falls within several of the mandatory categories, including family planning services, physicians' services, outpatient hospital services, and inpatient hospital services. *Doe v. Busbee,* 481 F.Supp. 46, 49 (N.D. Georgia 1979); *Roe v. Norton,* 522 F.2d 928, 933 (2nd Cir. 1975), *rev'd on other grounds, Maher v. Roe,* 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977).

Under Arkansas' plan, the categorically needy and medically needy are entitled to receive inpatient hospital services, outpatient hospital services, family planning services, physicians' services and ESPDT services. Arkansas and other participating states are required by federal regulations to make certain that "each service must be sufficient in amount, duration and scope to reasonably achieve its purpose. The Medicaid agency [the state agency administering the state's plan for medical assistance] may not deny or reduce the amount, duration, or scope of a required service ... for the categorically needy and ... the medically needy to an otherwise eligible recipient solely because of the diagnosis, type of illness, or condition." 42 C.F.R. § 440.230(b) and (c)(1).[3] Regarding mandatory services, the state plan must cover medical services that a person's physician certifies are "medically necessary." *Weaver,* supra, at 200; *Pinneke v. Preisser,* 623 F.2d 546, 548 n. 2 (8th Cir.1980). Courts have recognized that "the decision of whether or not certain treatment or a particular type of treatment is 'medically necessary' rests with the individual recipient's physician and not with clerical personnel or government officials." *Pinneke,* at 550. The Supreme

Court stated in *Doe v. Bolton,* 410 U.S. 179, 192, 93 S.Ct. 739, 747, 35 L.Ed.2d 201 (1973) in reviewing a Georgia statute that "the medical judgment may be exercised in the light of all factors—physical, emotional, psychological, familial, and the woman's age—relevant to the well-being of the patient. All these factors may relate to health. This allows the attending physician the room he needs to make his best medical judgment. And it is room that operates for the benefit, not the disadvantage, of the pregnant woman."

 Defendants allege that Congress has not set forth specific requirements in Title XIX to cover abortions. Plaintiffs, however, correctly point out that the absence of the word "abortion" in Title XIX is irrelevant, for Title XIX does not identify *any* specific medical procedures, whether they are cesarean sections, transfusions, bypass surgery, or abortions. (Plaintiffs' reply to defendants' response to plaintiffs' summary judgment motion, March 4, 1994, at 4). What Title XIX does is to specify the categories of care cited above that every state Medicaid program must cover when "medically necessary" (physicians' services, family planning services, inpatient hospital services, outpatient hospital services). 42 U.S.C. 1396d(a)(i–v). Because abortion falls within several of these mandated categories, a medically necessary abortion is a mandatory covered service. As will be discussed below, Title XIX and the Hyde Amendment establish the minimum circumstances in which a state's Medicaid program must cover abortions.

Since abortion falls within several of the mandatory categories, between 1973 and 1976 Medicaid covered medically necessary abortions. However, in 1976, Congress en-

---

**3.** Courts have cited this provision in ruling that an abortion needed to prevent mental health damage should not be considered less important than one designed to prevent physical health damage. The Court in *Preterm* was troubled by the language in the 1978 fiscal year Hyde Amendment that permitted funds for abortions needed to prevent "severe and long-lasting physical health damage." *Preterm,* supra, at 131. The Court was concerned that the reference to "physical health damage" impliedly excluded abortions needed to prevent "severe and long-lasting mental health damage ... Such a dis-

crimination carried to the point of total denial of abortion services when serious injury to a person's mental health if the pregnancy is carried to term is diagnosed, cannot, we believe, be considered to be based on medical need. The discrimination sets up a presumption that physical health damage is always more serious and hence more important to prevent than mental health damage, a presumption that is nothing less than absurd." *Id.* The current version of the Hyde Amendment does not make any distinction between physical and mental health.

acted the Hyde Amendment to the Health, Education and Welfare appropriation for fiscal 1977. The original Hyde Amendment prohibited federal reimbursements for abortions except for the categories Congress declared medically necessary, which at that time included only cases where the "life of the mother would be endangered if the fetus were carried to term." *Roe v. Casey*, 623 F.2d 829, 833 n. 10 (3d Cir.1980). The Amendment does not restrict participating states' use of state funds to provide abortions through Medicaid or any other state program, as the states remain free to fund more abortions than those for which federal funds were made available under the Hyde Amendment. *Preterm*, supra, at 134.[4] A subsequent version of the Amendment expanded the funding to include victims of rape or incest and "instances where severe and long-lasting physical health damage to the mother would result if the pregnancy were carried to term when so determined by two physicians." *Roe v. Casey*, at 833 n. 10. The fiscal year 1980 Hyde Amendment deleted the category regarding "physical health damage" but still included the category for victims of rape or incest. *Id.* From fiscal years 1982 to 1993 the Hyde Amendment limited medically necessary and thus federally funded abortions to cases where the mother's life was in danger. On Oct. 22, 1993, the Amendment changed again, as President Clinton signed into law a version of the Hyde Amendment that provides federal Medicaid funds for the larger range of abortions that had existed in the 1982 federal budget. The Amendment now provides that "None of the funds appropriated under this Act shall be expended for any abortion except when it is made known to the Federal entity or official to which funds are appropriated under this Act that such procedure is necessary to save the life of the mother or that the pregnancy is the result of an act of rape or incest." (Appropriations for the Departments of Labor, Health, and Human Services, and Education, for the fiscal year ending Sept. 30, 1994).

In 1988, Arkansas added Amendment 68 to its Constitution by a vote of 398,107 to 368,117, thus restricting state Medicaid coverage of abortions. The Amendment states: "No public funds will be used to pay for any abortion, except to save the mother's life. The policy of Arkansas is to protect the life of every unborn child from conception until birth, to the extent permitted by the Federal Constitution. This amendment will not affect contraceptives or require an appropriation of public funds." Arkansas' Medicaid plan reflects the provisions of Amendment 68, which is challenged in the instant case. There have also been recent challenges to restrictions on Medicaid coverage of abortion in Pennsylvania, Florida, Michigan, Minnesota, Texas, Idaho, Montana, Colorado and Illinois. The parties acknowledge that the issues presented in this case are similar to those in other litigation throughout the country where states are encountering challenges to their Medicaid plan.

## AMENDMENT 68 IS IN CONFLICT WITH THE 1994 HYDE AMENDMENT

■ The Supremacy Clause of the United States Constitution, Article VI, Clause 2, provides that "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." The Supremacy Clause requires courts to declare invalid any state constitutional provision that conflicts with federal law. *Reynolds v. Sims*, 377 U.S. 533, 584, 84 S.Ct. 1362, 1393, 12 L.Ed.2d 506 (1964). As the Court emphasized in invalidating an Arkansas constitutional amendment that opposed United States Supreme Court desegregation decisions, state constitutional provisions are no different than other state laws regarding Supremacy Clause issues. *Dietz v. Arkansas*, 709 F.Supp. 902

---

4. Thirteen states now cover all medically necessary abortions for indigent women from state funds that are not matched by federal funds. Another six states—Iowa, Minnesota, Pennsylvania, Virginia, Wisconsin and Wyoming) covered abortions for rape and incest survivors even before they were required by the Hyde Amendment to do so.

(E.D., Arkansas, 1989). In another case dealing with, *inter alia*, the Supremacy Clause, the Eighth Circuit ruled that "Missouri participates in a federal program [in that case Aid to Families with Dependent Children] and receives federal funds. As a condition of receiving such funds, Missouri must comply with program requirements and cannot refuse to comply with federal regulations governing the program by simply stating that the monies it seeks to recover are governed by state law." *Jackson v. Rapps*, 947 F.2d 332, 337 (8th Cir.1992).

Several federal court decisions were handed down in 1979–1980 that dealt with issues that are similar to those presented in the case at bar.[5] *Roe v. Casey*, supra, involved a Pennsylvania state law that was similar to Arkansas Amendment 68 in that it prohibited the Commonwealth from "paying for, making reimbursement for, or otherwise ... supporting the performance of any abortion except where the abortion is certified in writing by a physician to be necessary to save the life of the mother." *Casey*, at 831. The Hyde Amendment that was in effect at the time of *Casey* (it was approved in November, 1979, for the fiscal year 1980) was similar to this year's Amendment, since it expanded funding to include not only abortions to save the mother's life, but also in cases of rape or incest. *Id.* at 833 n. 1. The *Casey* Court ruled that the Hyde Amendment constitutes a substantive modification of Title XIX. *Id.* at 836. In striking down the Pennsylvania law, the Third Circuit held:

> Title XIX [of the Social Security Act, commonly known as the Medicaid Act] as now modified requires the states to fund abortions in two categories: where the mother is endangered and where the pregnancy was the result of rape or incest. Pennsylvania, under Public Laws 16A and 148,

would not fund the second category. Because Pennsylvania's statutes are not consistent with the modified Title XIX it is clear that, as written, they cannot stand. To conform with the Hyde Amendment, the Pennsylvania statutes would have to provide funding for rape and incest cases in addition to those situations where abortions are necessary because of danger to the mother's life. *Id.* at 836–837.

The *Roe v. Casey* Court pointed out that "Three other circuit courts have recently dealt with these issues. *Hodgson v. Board of County Commissioners*, 614 F.2d 601 (8th Cir.1980); *Preterm, Inc. v. Dukakis*, 591 F.2d 121 (1st Cir.1979), *cert. denied*, 441 U.S. 952, 99 S.Ct. 2181, 2182, 60 L.Ed.2d 1057 (1979); *Zbaraz v. Quern*, 596 F.2d 196 (7th Cir.1979). Our reasoning in this appeal is essentially in accord with the reasoning of the First, Seventh and Eighth Circuits." *Id.* at 831 n. 5. In *Hodgson*, the Eighth Circuit ruled that "Title XIX, as originally enacted, conflicts with and thus supersedes Minnesota's statutory restriction on abortion financing. We also hold, however, that the Hyde Amendment has altered Title XIX's requirements, with the result that, as a statutory matter, Minnesota need only finance those abortions contemplated by the Hyde Amendment." *Hodgson*, at 605. The Minnesota statute at issue was not identical to Arkansas Amendment 68, as the statute provided medical payment reimbursements for abortions necessary to prevent the woman's death or to terminate pregnancies resulting from rape or incest, but the Eighth Circuit clearly stated the basic principle that Minnesota must finance "those abortions contemplated by the Hyde Amendment." *Id.* at 601, 605.

In *Frieman, M.D. v. Walsh*, 481 F.Supp. 137, 139 (W.D.Missouri, C.D., 1979), the Court dealt with Missouri statutory and reg-

---

**5.** In this Court's June 7, 1994 Order granting defendants' motion to file a supplemental brief and requesting 20 days in which to do so, the Court asked defendants to address these federal court decisions. In its June 23 supplemental brief, defendants stated that "This Court has ordered defendants to file a brief addressing several issues currently before the Court." Actually, the Court stated in its June 7 Order that "Defendants may respond to any of the issues plaintiff discussed in its briefs and any other relevant issue they choose to address." The Court also asked defendants to address several other issues. Defendants, in fact, received three Orders granting extensions of time in which to file briefs in the course of this litigation. (Orders of Nov. 26, 1993; Feb. 4, 1994; and June 7, 1994). The Court was pleased to give both parties ample opportunity to research and state their arguments regarding this case, and as a result, both parties provided the Court with an exhaustive treatment of the legal issues involved.

ulatory law that prohibited public funds from being expended on abortions except where the mother's life was endangered. The Court enjoined Missouri from enforcing its state law "except insofar as it is consistent with the language of the current Hyde Amendment. Defendants are further ordered to provide funding for all abortions for which the federal government contributes its share pursuant to the Medicaid Act and to continue to provide such funding for so long as it is a participant in the federal Medicaid program." *Id.* at 147. Citing *Hodgson, Preterm,* supra, and *Zbaraz,* supra, the Eighth Circuit stated in reviewing the District Court's decision in *Frieman v. Walsh* that, "We therefore affirm the district court on its Hyde Amendment holding." *Reproductive Health Services v. Freeman,* 614 F.2d 585, 591–592 (8th Cir.1980); *vacated on other grounds,* 449 U.S. 809, 101 S.Ct. 57, 66 L.Ed.2d 13 (1980).

The Seventh and First Circuits also handed down rulings similar to those in *Roe v. Casey* and *Hodgson.* In *Zbaraz v. Quern,* 596 F.2d 196 (7th Cir.1979), the Seventh Circuit dealt with an Illinois statute that withdrew funding for all abortions except those necessary to save the mother's life. The Seventh Circuit concluded that "The Court of Appeals for the First Circuit has recently ruled on a challenge to the Massachusetts abortion funding law that is nearly identical to the challenge mounted here to the similar Illinois law. *Preterm, Inc. v. Dukakis* [supra] ... We agree with the conclusion of the majority in *Preterm* that the Hyde Amendment alters Title XIX in such a way as to allow states to limit funding to the categories specified in that amendment." *Zbaraz,* at 198. In *Preterm,* the First Circuit enjoined implementation of the Massachusetts statute "insofar as it prohibits state reimbursement for abortions which would qualify for federal reimbursement under the terms of the Hyde Amendment." *Preterm,* at 134. Similarly, the *Zbaraz* Court held that the Hyde Amendment mandated abortion funding in two categories of cases not covered by the Illinois statute—"cases of promptly reported rape or incest, and cases in which severe and long-lasting damage to the mother's physical health would result

from continuing the pregnancy. Illinois is required to fund abortions falling into these categories under its Medicaid plan and is entitled to the usual federal reimbursement." *Zbaraz,* at 199 n. 7.

The intent of Congress in passing the 1994 Hyde Amendment was made clear during the floor debates. Members of Congress from both sides of the ideological debate concerning abortion made explicit in the legislative history of the Hyde Amendment that state Medicaid programs must cover abortion to the extent that federal matching funds are available. Senator Orrin Hatch stated during the debate on the Hyde Amendment that "If federal funding of abortion is mandated through Medicaid, every state will be required to provide matching funds for abortion on demand." 139 *Cong.Rec.* 12,581 (Sept. 28, 1993). An opponent of the Hyde Amendment's general funding restrictions stated that those restrictions would require Medicaid funding "only in certain circumstances; rape, incest, or to save the life of a woman. Those are excellent criteria. But they should not be the only criteria ..." 139 *Cong.Rec.* S12,582 (Statement of Sen. Mikulski, Sept. 28, 1993). An opponent of expanding the Hyde exceptions stated that he disliked the expanded funding "which includes exceptions for rape and incest." *Id.* at S12,-587 (Statement of Sen. Hatfield, Sept. 28, 1993). Another abortion opponent asserted that "If we have this as a federal government policy for the federal government to pay for abortion, the states likewise have to match those funds ... This is not a state opt-out. There are no state options. States have to match the federal funds." *Id.* at S12,588 (Statement of Sen. Nickles).

Plaintiffs point out that in previous years, when Congress has intended coverage of abortions falling in the Hyde Amendment's scope to be discretionary with the states, it explicitly provided for it; in the fiscal year 1981 Hyde Amendment (the Amendment passed the year after the 1980 fiscal year Amendment that was considered in *Roe v. Casey* ) the Congress added the "Bauman Amendment" language to the Hyde Amendment: "Provided, however, that the several states are and shall remain free not to fund

abortions to the extent that they in their sole discretion deem appropriate." Pub.L. 96–369, Section 101(c), 94 Stat. 1353 (96th Congress) (Oct. 1, 1980). The 1994 Hyde Amendment does not grant states the discretion to cover abortions for which federal money is appropriated, and this absence of "Bauman Amendment" language also supports the conclusion that Arkansas must cover all abortions for which federal funding is available. Although plaintiff's argument is plausible on this point, *Roe v. Casey* and the other cases discussed in this Order provide ample authority supporting plaintiff's basic position, even without relying upon the contention regarding the absence of "Bauman Amendment" language in the 1994 version of the Hyde Amendment.

A recent decision in a Montana state court involves issues similar to those in the instant case. A Montana administrative regulation provided that in order to receive Medicaid payments, a physician had to find that the mother's life would be endangered; the dispute in that case arose out of the conflict between Montana state law and the 1994 Hyde Amendment. *Jeanette R., et al., v. State of Montana, Nancy Ellery, as Administrator of the Medicaid Services Division of the Montana Department of Social and Rehabilitation Services*, No. BDV–94–811, Montana First Judicial District Court, June 1, 1994. (See the Montana Court's opinion published as an appendix to this opinion.) The Montana Court relied upon *Roe v. Casey* and similar federal decisions in rejecting the defendants' contention that they need not provide Medicaid funding for abortions resulting from rape or incest: "The federal decisions are basically to the effect that a state's Medicare funding program cannot be more restrictive than the Hyde Amendment. A case almost identical to the present case is *Roe v. Casey* ... The version of the Hyde Amendment with which the *Roe* Court was dealing was almost identical to the one with which we are here involved." *Jeanette R.*, infra, at 629. The Court in *Jeanette R.* enjoined Montana from restricting Medicaid reimbursement for abortions in a manner inconsistent with the Hyde Amendment, holding that "Montana cannot have a Medicaid reimbursement formula that is more restrictive

than the formula provided by the federal government ... If Montana uses federal Medicaid funds, it must follow the federal law." *Id.* at 630–631.

In a similar case in Michigan, the U.S. District Court held that a state statute prohibiting public funding for abortions except to save the mother's life "cannot stand. Accordingly, the Court will enjoin defendants from enforcing [the Michigan statute] insofar as it prohibits state funding for abortions to terminate pregnancies resulting from acts of rape or incest, as required by Title XIX, modified by the Hyde Amendment, while at the same time accepting federal funds pursuant to Title XIX." *Planned Parenthood Affiliates of Michigan v. Engler*, 860 F.Supp. 406, 407, 410 (W.D.Michigan 1994).

Defendants contend that *Zbaraz* and the three other Circuit Court cases cited above would not lead to the conclusion that Arkansas is obligated to cover abortions for rape and incest in its Medicaid program, stating that "all these cases predate a U.S. Supreme Court decision concerning the Hyde Amendment"—*Harris v. McRae*, 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980). (Defendant's supplemental brief, at 2). The Court disagrees with defendants' reliance on *Harris;* far from undermining the holding of the four relevant Circuit Court decisions, *Harris* actually cited all four of them with approval. *Harris*, supra, at 310, 100 S.Ct. at 2684. *Harris* involved a much broader and different set of issues than the instant case; in *Harris*, a number of indigent pregnant women as well as hospitals that performed abortions challenged the Hyde Amendment in its entirety, arguing that it unconstitutionally limited the funding of abortions to a restricted category while permitting the funding of costs associated with childbirth. In contrast, in *Little Rock Family Planning Services v. Dalton*, the plaintiffs are relying upon the Hyde Amendment rather than attacking it. The *Harris* Court began with the proposition that a state participating in the Medicaid program is not obligated under Title XIX "to pay for those medically necessary abortions

for which federal reimbursement is unavailable under the Hyde Amendment." *Id.* The holdings in *Harris* upheld the Hyde Amendment against an argument that the Amendment's restrictions on the availability of certain medically necessary abortions under Medicaid impinged on the liberty protected by the Due Process Clause of the Fourteenth Amendment of a woman to decide whether to terminate a pregnancy. *Harris,* at 312, 100 S.Ct. at 2685, citing *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973).[6] *Harris* also upheld the Amendment against the argument that it was unconstitutionally vague because "physicians are unable to understand or implement the exceptions in the Hyde Amendment under which abortions are reimbursable." *Id.,* 448 U.S. at 311, 100 S.Ct. at 2685. The Court rejected this argument, concluding that "the exceptions in the Hyde Amendment 'are set out in terms that the ordinary person exercising ordinary common sense can sufficiently understand and comply with, without sacrifice to the public interest.' " *Id.,* citing *Broadrick v. Oklahoma,* 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). In the Supreme Court's rulings upholding the Amendment, and in the Court's assumption that funding was required for all abortions for which federal funding was available, *Harris* was perfectly consistent with the four Circuit Court decisions.

Defendants also cite the ruling in *Webster v. Reproductive Health Services, et al.,* 492 U.S. 490, 509, 109 S.Ct. 3040, 3052, 106 L.Ed.2d 410 (1989) that "Nothing in the Constitution requires States to enter or remain in the business of performing abortions." *Webster,* at 510, 109 S.Ct. at 3052. Again, *Webster* involved a much broader set of questions than the relatively narrow category of issues in *Little Rock Family Planning Services.* While stopping short of arguing that *Roe v. Wade* should be overruled, the plurality opinion in *Webster* launched a sharp critique against *Roe's* fundamental trimester framework, (although a subsequent Supreme Court case explicitly held that *Roe v. Wade* remains the law of the land, *Planned Parenthood of Southeastern Pennsylvania v. Casey,* — U.S. —, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992)) which it criticized as "unworkable in practice;" the Court also addressed an issue regarding the broad question of when human life begins, and a series of detailed regulations regarding abortion in a Missouri statute. *Webster,* 492 U.S. at 490–491, 511–517, 109 S.Ct. at 3041–3043, 3053–3056. Such fundamental issues involving the basic validity of *Roe v. Wade* and progeny soar far beyond the limited range of issues involved in this case, which exclusively deals with the inconsistency between Arkansas Amendment 68 and the 1994 Hyde Amendment.

It is certainly correct that states are not constitutionally required (except, of course, from the standpoint of the Supremacy Clause issues discussed above) to fund abortions; as the Supreme Court ruled in *Maher v. Roe,* 432 U.S. 464, 469, 97 S.Ct. 2376, 2380, 53 L.Ed.2d 484 (1977), "the Constitution imposes no obligation on the States to pay the pregnancy-related medical expenses of indigent women, or indeed to pay any of the medical expenses of indigents." *Maher,* at 469, 97 S.Ct. at 2380. *Webster* cited the general proposition that "Our cases have recognized that the Due Process Clauses generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual." *Webster,* supra, 492 U.S. at 507, 109 S.Ct. at 3051, citing *DeShaney v. Winnebago County Dept. of Social Services,* 489 U.S. 189, 196, 109 S.Ct. 998, 1003, 103 L.Ed.2d 249 (1989). The Court stated in *Harris v. McRae* that "although government may not place obstacles in the path of a woman's exercise of her freedom of choice, it need not remove those not of its own creation. Indigency falls into

---

**6.** Much of the opinion in *Harris* dealt with an issue wholly unrelated to the case at bar—it upheld the Hyde Amendment against a challenge that it violated the Establishment Clause's prohibition against any "law respecting an establishment of religion," based upon an allegation that the Hyde Amendment incorporates into law Roman Catholic doctrine concerning the "sinfulness" of abortion and the time at which life commences. *Harris,* 448 U.S. at 311, 319, 100 S.Ct. at 2685, 2689. Obviously, no Establishment Clause issues have been presented to the Court in the case at bar.

the latter category." *Harris,* 448 U.S. at 316, 100 S.Ct. at 2687. Yet, the Court made it clear in *Harris* that whether a woman's constitutionally protected freedom of choice to terminate a pregnancy warrants subsidization "is a question for Congress, not a matter of constitutional entitlement." *Harris,* 448 U.S. at 318–19, 100 S.Ct. at 2689. The constitutional rulings regarding abortion in general that defendant cites from *Webster* are much broader than the specific question of whether Congress decided that subsidization is warranted in the narrow category of Hyde Amendment exceptions for saving the mother's life, rape and incest. Congress spoke to this issue clearly in the Amendment and its exceptions, and in similar decisions courts have clearly ruled in a manner supporting plaintiffs' substantive position in the case at bar. *Roe v. Casey, Hodgson, Zbaraz, Preterm, Frieman v. Walsh,* 481 F.Supp. at 147, supra, *Jeanette R.,* supra, and *Planned Parenthood Affiliates of Michigan v. Engler,* 860 F.Supp. 406 (W.D.Michigan 1994).

In support of its summary judgment motion, plaintiffs also cite the Dec. 28, 1993 directive from the Director of the Medicaid Bureau of the federal Health Care Financing Administration (HFCA) to state Medicaid directors, which directive stated that "As with all other mandatory medical services for which Federal funding is available. States are required to cover abortions that are medically necessary. By definition, abortions that are necessary to save the mother's life are medically necessary. In addition, Congress this year added abortions for pregnancies resulting from rape and incest to the category of medically necessary abortions for which funding is provided ... Therefore, abortions resulting from rape or incest should be considered to fall within the scope of services that are medically necessary." (Plaintiffs' motion for summary judgment, at 11). Similarly, plaintiffs note that the Jan. 5, 1994 letter of the Administrator of HFCA to Ray Hanley, Arkansas' Medicaid Director, stated that if state law conflicts with the current Hyde Amendment "court decisions require that state law give way to federal law insofar as it applies to the Medicaid program.

*Id.* In addition, plaintiffs cite the March 25, 1994 letter of Sally Richardson, Director of the HFCA Medicaid Bureau, to all the state Medicaid directors in which she stated, "Federal courts that have considered this issue in the past have held that State law impediments cannot stand in the way of an individual's entitlement under a State's Medicaid program to medically necessary services, including abortions, for which Federal funds are available." (Plaintiffs' supplemental brief of April 7, 1994, at 2). Plaintiffs concede, however, that it is not necessary for them to rely on the HFCA directives, and this Court agrees; the other precedents cited in this Order are more than sufficient to decide this case. No administrative action is pending in this case, which involves strictly legal issues. While the summaries of "federal court decisions" in the HFCA letters are correct, the Court need not reach the administrative law issues of whether these agency directives are entitled to substantial deference by this Court, because the four Circuit Court decisions cited above, other cases and the Hyde Amendment's legislative history are clearly sufficient to resolve the dispositive issue in this case.

## THIS COURT CANNOT REWRITE AMENDMENT 68

Pursuant to the above analysis, Amendment 68 violates the Supremacy Clause because it is in conflict with federal law. The Amendment's Section 1, which states that "No public funds will be used to pay for any abortion, except to save the mother's life," is invalid and its enforcement is enjoined. This Court cannot rewrite Amendment 68 to preserve its constitutionality. In addressing a similar issue in *Roe v. Casey,* the Third Circuit concluded that to conform with the Hyde Amendment, Pennsylvania state law would have to provide funding for rape and incest cases in addition to abortions needed to save the mother's life. *Roe v. Casey,* supra, at 837. This would have required additions of specific language to the state laws, and Pennsylvania permits courts to add wording to its statutes only when such additions do not "in any way affect the scope and operation of the statute." The Court

concluded that if it added provisions to the Pennsylvania statute to require payment for abortions in cases of rape and incest, the scope and operation of the state enactments would obviously be expanded. "In that event," the Court emphasized, "we would have exceeded our judicial role and we would be engaging in positive legislative enactment, a proper function of the Pennsylvania Assembly, which it has reserved to itself ... Long established principles of federal law also dictate against courts inserting limitations in order to rescue otherwise invalid statutes." *Id.; Baird v. Bellotti,* 450 F.Supp. 997 (D.Mass.1978), *affirmed,* 443 U.S. 622, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979).

In holding that it could not redraft the Pennsylvania prohibition on state funding of abortion, the Third Circuit stated:

> "There is nothing in the record to indicate what course Pennsylvania would choose to follow given the amendment to Title XIX by the Hyde enactment and we are not free to substitute our speculation for the judgment of the duly constituted officials of the state. This court should refrain from acting on a 'matter which properly requires the exercise of policy judgment by the legislature.'" 2A Sands, Sutherland, *Statutory Construction,* Section 47.36 (4th ed. 1973).

The Eighth Circuit cited *Roe v. Casey* in a similar case in which it refused to preserve a state statute by rewriting it. *Valley Family Planning v. State of North Dakota,* 661 F.2d 99, 102 (8th Cir.1981). In *Valley Family Planning,* plaintiffs challenged a North Dakota statute providing that no state funds "shall be used as family planning funds by any person, public or private agency which performs, refers, or encourages abortion." *Id.* at 100. The Eighth Circuit held that the statute was in conflict with a federal provision mandating that comprehensive health care be provided by its grantees, including referrals to other services that were medically indicated, and thus the state statute was invalid under the Supremacy Clause. *Id.* In refusing to rewrite the statute, the Court held that "We are not inclined to cure the invalidity of [the North Dakota statute] by writing in exceptions to its referral prohibi-

tion; that would involve this Court in positive legislative enactment clearly beyond its judicial role. *See Roe v. Casey,* 623 F.2d 829, 837." *Valley Family Planning,* at 102.

Federal courts have frequently stressed the importance of declining to redraft invalid state enactments, citing principles of separation of powers as well as "federalism and comity." *Eubanks v. Wilkinson,* 937 F.2d 1118 (6th Cir.1991); *National Advertising Company v. Niagara,* 942 F.2d 145, 150 (2nd Cir.1991). The Supreme Court ruled that "The canon of construction that a court should strive to interpret a statute in a way that will avoid an unconstitutional construction is useful in close cases, but it is not 'a license for the judiciary to rewrite language enacted by the legislature.'" *Chapman v. United States,* 500 U.S. 453, 464, 111 S.Ct. 1919, 1927, 114 L.Ed.2d 524 (1991); citing *United States v. Monsanto,* 491 U.S. 600, 611, 109 S.Ct. 2657, 2664, 105 L.Ed.2d 512 (1989). Similarly, the Eighth Circuit has held that "we find it beyond our power as a federal court to rewrite the broad, straightforward language [of the state provision] to avoid the constitutional difficulties presented by the plain meaning of its terms." *United Food and Commercial Workers International Union, AFL–CIO v. IBP, Inc.,* 857 F.2d 422, 431 (8th Cir.1988). In *Eubanks v. Wilkinson,* 937 F.2d 1118 (6th Cir.1991), physicians challenged a Kentucky statute requiring physicians who performed abortions for minors to secure the signed and notarized "informed consent" of the minor and also of both parents "if available"; the District Court found portions of the state statute unconstitutional but preserved the statute by modifying one provision and severing the others. In reversing the trial court in part and affirming in part, the Circuit Court of Appeals held that "having found that the statute unduly burdened the right to an abortion, the District Court could not supply new limiting language to modify the statute so as to avoid unconstitutionality" but had to sever the unconstitutional section entirely. *Id.* The Sixth Circuit stressed that "In this case we must weigh both the need to keep legislative and judicial power separate and the need to respect state judicial policy regarding revision of state statutes. In applying the doc-

trine of judicial review, our jurisprudence in this area of interpretation stresses both separation of powers and federalism concerns." *Id.,* at 1127. Similarly, in striking down an ordinance in its entirety the Second Circuit cited "the interests of federalism and comity dictate conservatism in imposing our interpretive views on state statutes. *See Brockett v. Spokane Arcades,* 472 U.S. 491, 105 S.Ct. 2794, 86 L.Ed.2d 394 (1985) (O'Connor, J., concurring). Mindful of our responsibility to respect ... federalism, we find that the ordinance must be declared unconstitutional as a whole." *National Advertising Co. v. Niagara,* supra, at 151.

The Arkansas Supreme Court has held that in construing a constitutional amendment passed by voter initiative, when part of the amendment was held invalid, "the intent of the people is controlling." *Faubus v. Kinney,* 239 Ark. 443, 450, 389 S.W.2d 887 (1965). This Court lacks any compass to direct it in redrafting the provision to make it conform to federal law as well as to the wishes of Arkansas voters. To follow the Hyde Amendment, the state must establish two additional classes of funding for rape and incest victims. It is not possible for this Court to divine all the details involved regarding how Arkansas would wish to do that, for the extension of coverage raises several issues. Plaintiff points out that the relevant issues would include: whether Medicaid coverage would be based upon a reporting or documenting of the rape or incest; whether there would be a time limit on the reporting requirement; to whom would the report be addressed; would the confidentiality of the reporting woman or girl be protected; would the burden of reporting be on the woman or girl, or her doctor; would the victim have to name the perpetrator in the report; would waivers of the reporting requirement be authorized; and how would rape and incest be defined for purposes of Medicaid reimbursement. The Court has no way of knowing how the people will resolve these detailed questions. Moreover, the manner in which all of these issues are resolved obviously cannot conflict with federal law.

The people of Arkansas may choose to opt out of the Medicaid program entirely, or they may choose to adopt an expanded version of Amendment 68. Arkansas voters may extend coverage for medically necessary abortions to cases where there are fetal anomalies or where the woman's health would incur serious damage, or alternatively, they may choose to confine the state to the minimum provisions that must be covered, as mandated in the Hyde Amendment. This Court takes no position, of course, on any of these questions, and cannot know how the voters will choose to respond to the situation created by Amendment 68's conflict with federal law. Pursuant to its appropriate judicial role, the Court concludes that the Amendment must be stricken in its entirety, to enable the people or their elected representatives to decide how Arkansas will cover abortion in the state Medicaid program so that it will not conflict with federal law.

Defendants also contend that if Amendment 68, Section 1 is stricken, it must not be stricken in its entirety, citing *United States v. Salerno,* 481 U.S. 739, 745, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697 (1987) (in which the Bail Reform Act of 1984 was challenged as allegedly unconstitutional) for the proposition that "A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid. The fact that the Bail Reform Act might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid, since we have not recognized an 'overbreadth' doctrine outside the limited context of the First Amendment." Defendants assert that *Salerno* bars facial challenges to Amendment 68. However, plaintiffs point out that this case is not a facial challenge to a law before its effective date. Amendment 68 prevents Arkansas' Medicaid program from complying with the Hyde Amendment that became effective late last year, and plaintiffs and their patients are being injured; therefore, this case does not present a mere hypothetical possibility that the Amendment "might operate unconstitutionally under some conceivable set of circumstances." *Salerno,* at 745, 107 S.Ct. at 2100. Plaintiffs are challenging the actual application of Amendment 68, and are not

asserting a far-fetched construction that may never happen; in *Ohio v. Akron Center for Reproductive Health,* 497 U.S. 502, 514, 110 S.Ct. 2972, 2981, 111 L.Ed.2d 405 (1990), the Supreme Court reversed a Court of Appeals ruling that had invalidated a statute "on a facial challenge based upon a worst-case scenario that may never occur." Moreover, *Little Rock Family Planning Services* contrasts with *Salerno,* where the litigants did not argue that "the Act is unconstitutional because of the way it was applied to the particular facts of their case," *Salerno,* 481 U.S. at 745 n. 3, 107 S.Ct. at 2100 n. 3, whereas the plaintiffs here contend that they are injured by the application of Amendment 68's prohibition on abortion coverage for rape and incest survivors who are eligible for Medicaid.

▮ Defendants further argue that Amendment 68 "has other constitutional purposes" and thus survives the plaintiffs' challenge. Regarding these purported "other purposes," defendants state that the Arkansas Crime Victims Reparations Act, A.C.A. § 16–90–701 et seq. created the Crime Victims Reparations Board, which provides a method of compensating and assisting people in Arkansas who are victims of criminal acts and are injured or killed. "Allowable expense" under this Act includes medical care. A.C.A. § 16–90–703(7). The Board receives requests for payment of medical care to provide abortions, but these requests are denied based on Amendment 68. (Affidavit of Ginger Bailey). Defendants' argument regarding the alleged "other purposes" is without merit. Plaintiffs point out that at best, this argument is based on the notion that Amendment 68, Section 1 is invalid regarding Medicaid recipients, but valid insofar as it applies to applicants to the Arkansas Crime Victims Reparations Board. Pursuant to *Roe v. Casey* and the other cases cited above stating the principle that federal courts should not rewrite state constitutional amendments, this Court will refrain from redrafting Amendment 68 to restrict its applicability to the Crime Victims Reparations Board. The Court has no way of discerning whether Arkansas voters would have passed the Amendment solely to limit assistance and reparations to indigent women who have been the victims of rape or incest.

Defendants contend that even if this Court "decides to strike Amendment 68, Section 1, the remaining sections of the amendment would be unaffected." (Defendant's response to plaintiff's summary judgment motion, at 19). Both parties agree that the issue of severability is based on state law. *Webster v. Reproductive Health Services,* supra, 492 U.S. at 524, 109 S.Ct. at 3060 (Justice O'Connor's concurring opinion); *Exxon v. Hunt,* 475 U.S. 355, 376, 106 S.Ct. 1103, 1116, 89 L.Ed.2d 364 (1986); *National Advertising Company v. Niagara,* supra, at 145. In addition to the core provision, Section 1 of Amendment 68, the other two Sections read as follows: "Section 2, Public Policy: The policy of Arkansas is to protect the life of every unborn child from conception until birth, to the extent permitted by the Federal Constitution. Section 3, Effect of the amendment: This amendment will not affect contraceptives or require an appropriation of public funds." Amendment 68, Constitution of the State of Arkansas, Arkansas Code of 1987 Annotated, *Constitutions.*

▮ The Court concludes that Amendment 68 does not contain several independent parts, so that after Section 1 is stricken, the rest cannot remain. There is an issue as to whether the State officials and the people of Arkansas would continue in the Medicaid program if the Hyde Amendment is enforced. Thus, the people should be given the opportunity to decide whether they wish to continue receiving federal funds under the Medicaid Act. It would be improper for a federal court to redraft a state constitutional amendment. *Roe v. Casey,* at 837. As the Arkansas Supreme Court held in a major severability case, "The test should be the sufficiency for practical working purposes of that portion of the act remaining after" the invalid section has been removed. *Allen v. Langston,* 216 Ark. 77, 85, 224 S.W.2d 377 (1949); citing *Oliver v. Southern Trust Co.,* 138 Ark. 381, 212 S.W. 77 (1919). If the sections are "so mutually connected with and dependent on each other, as conditions, considerations, or compensations for each other, as to warrant the belief that the Legislature

would not pass the residue independently, then if some parts are unconstitutional, all the provisions which are thus dependent, conditional, or connected must fall with them." *Id.*, 216 Ark. at 85, 224 S.W.2d 377. Rules governing the construction of statutes "are the same as those governing the construction of constitutional amendments." *Bailey v. Abington,* 201 Ark. 1072, 148 S.W.2d 176 (1941); *Faubus v. Kinney,* supra, 239 Ark. at 447, 389 S.W.2d 887. One relevant factor in making this determination is whether the provision contains a severability clause, and in this regard it is significant that Arkansas Amendment 68 does not have a severability clause. *Bates v. Bates,* 303 Ark. 89, 94, 793 S.W.2d 788 (1990). (The Arkansas Supreme Court has ruled that "The presence of a severability clause is a factor to be considered but, by itself, it may not be determinative." *U.S. Term Limits, Inc. v. Hill,* 316 Ark. 251, 266, 872 S.W.2d 349 (1994)). In *Bates,* the Supreme Court struck down the Domestic Abuse Act, which had no severability clause, despite the Court's agreement with the legislative intent behind the Act, holding that because one section of the law impermissibly placed jurisdiction over domestic abuse proceedings in chancery court, the entire statute was invalid. *Id.* "When an act does not contain a severability clause, and the various parts of it are so interdependent that it cannot be presumed the General Assembly would have enacted one section without the other, the whole act must fail." *Id.*, 303 Ark. at 93–94, 793 S.W.2d 788. Plaintiff correctly points out that in *Handy Dan Improvement Center, Inc. v. Adams,* 276 Ark. 268, 633 S.W.2d 699 (1982) the state's Sunday closing laws were invalidated in their entirety when the Court concluded that "The core provision of this act is Section 2," and since the provisions were dependent upon and connected with that core section, "the act is not severable and the entire act must fall on account of the invalidity of Section 2." *Handy Dan,* at 271, 277, 633 S.W.2d 699.

Similarly, in *Pryor v. Lowe,* 258 Ark. 188, 192, 523 S.W.2d 199 (1975), the Supreme Court held that the invalidity of a core provision on statutory limitations upon delegates to the "limited Constitutional Convention"

rendered the entire act invalid. In a recent Arkansas Supreme Court case involving the Supremacy Clause and severability, the Court invalidated a section imposing term limits on federal officials because it was in conflict with federal law. *U.S. Term Limits,* supra, 316 Ark. at 266–269, 872 S.W.2d 349. Citing *Faubus v. Kinney,* supra, the Court then read the amendment as a whole to determine whether the remaining sections were "complete in [themselves] and capable of being executed wholly independent of that which was rejected." The Court concluded that the three sections of the amendment were "grammatically independent and functionally independent." *U.S. Term Limits,* at 268–269, 872 S.W.2d 349. "Nor do we consider term limits on federal legislators," the Court ruled, "to be the bait which enticed voters to vote aye on the amendment as a whole." *Id.* The section on limiting federal officials could function independently from the section limiting terms for state officials, so the Court severed the invalidated section from the remaining sections. *Id.* In contrast, Amendment 68, Section 1's function of banning the great majority of public funding for abortions operates as the core provision—Section 2 is a general public policy statement and philosophical foundation for Section 1, and Section 3 is merely a descriptive statement. The latter Sections, as noted above, have no function independent of the first section. *Id.*

■ In the case at bar, Section 1 of Amendment 68 is the only section that has any independent force and is clearly the "core provision." *Handy Dan,* 276 Ark. at 271, 633 S.W.2d 699. Pursuant to *Allen,* supra, once Section 1's prohibition of public funding for abortion except to save the mother's life is removed, the remaining sections of the Amendment have no "practical working purposes." *Allen,* 216 Ark. at 85, 224 S.W.2d 377. Section 2's statement that Arkansas' policy "is to protect the life of every unborn child from conception until birth, to the extent permitted by the Federal Constitution," is explicitly a philosophical statement of the state's public policy and it has no force inde-

pendent of Section 1.[7] A public policy statement is not self-executing. *Forbes v. Ward,* No. 91–3149 (Chancery Court of Pulaski County, Fourth Division, June 30, 1993). The description of the effect of the amendment in Section 3—"this amendment will not affect contraceptives or require an appropriation of public funds"—also has no effect independent of Section 1. The heart and "core provision" of Amendment 68 is Section 1, and the other sections are so "mutually connected with and dependent on" Section 1 that Sections 2 and 3 would not have been passed independently. *Allen,* at 85, 224 S.W.2d 377. Sections 2 and 3 would be without any operative effect if allowed to stand by themselves, hence the entire Amendment must be invalidated.

Defendant cites *Berry v. Gordon,* 237 Ark. 865, 866, 376 S.W.2d 279 (1964) for the proposition that "If the part which remains after the defective portion is severed is capable of carrying out the purpose of the legislature, the courts will have little difficulty in finding the legislative intent to make separable, even if no separability clause has been included." In *Berry,* one section of a statute was held unconstitutional but the others were held severable because they could stand independently in "carrying out the purpose" of the measure. *Id.* Regarding Amendment 68, the purpose of the document was to prohibit public funding for abortions except to save the life of the mother, and that purpose was dependent upon Section 1; under *Berry,* as under *Allen* and the other Arkansas cases

cited, Amendment 68 fails the tests, for the other sections standing by themselves are incapable of carrying out the effect and purpose of the Amendment.

▮▮▮▮▮ If the Court concludes it must strike Section 1 based on the Supremacy Clause, defendants argue that the remaining sections should be left intact based on court decisions ruling that although federal courts have broad equitable powers to remedy constitutional violations, they must tailor the scope of injunctive relief to fit the nature of the constitutional violation. *Calvin Klein Cosmetics Corp. v. Parfums de Coeur, Ltd.,* 824 F.2d 665, 669 (8th Cir.1987); *Califano v. Yamasaki,* 442 U.S. 682, 702, 99 S.Ct. 2545, 2558, 61 L.Ed.2d 176 (1979); *Haitian Refugee Center v. Smith,* 676 F.2d 1023, 1041 (5th Cir.1982). The Court finds that *Calvin Klein* is not on point. The Eighth Circuit in *Klein* stated that Federal Rule of Civil Procedure 65(d) requires that every Order granting an injunction must set forth the reasons for it in specific terms and describe in reasonable detail the act or acts sought to be restrained. Fed.R.Civ.P. 65(d). Rule 65(d)'s specificity requirement is designed to prevent uncertainty and confusion on the part of those to whom the injunction is directed; in *Klein,* the Court stated that "Although the degree of particularity required of an injunction depends on the subject matter involved, ... we agree with Parfums [that a section of the Order granting injunctive relief] requires Parfums to guess at what kind of conduct" is prohibited. *Klein,* at 669.

---

7. In *Roe v. Wade,* supra, the Supreme Court concluded that "We need not resolve the difficult question of when life begins." *Roe v. Wade,* 410 U.S. at 159, 93 S.Ct. at 730. After reviewing the centuries of philosophical debate regarding this question, the Court concluded that "In view of all this, we do not agree that, by adopting one theory of life, Texas may override the rights of the pregnant woman that are at stake." *Id.,* at 162, 93 S.Ct. at 731. In *Akron v. Akron Center for Reproductive Health, Inc.,* 462 U.S. 416, 443, 103 S.Ct. 2481, 2499, 76 L.Ed.2d 687 (1983), the Court stated that "a State may not adopt one theory of when life begins to justify its regulation of abortions." In *Webster,* the Court dealt with the preamble to a Missouri statute that set forth "findings" that "life of each human being begins at conception," and "unborn children have protectable interests in life, health and well being." *Webster,* supra, 492 U.S. at 491, 109 S.Ct. at

3042. The Court in *Webster* upheld several operative provisions of the Missouri statute that were in separate parts of the act, and concluded that it was unnecessary to pass on the constitutionality of the preamble, which the Court concluded "constituted a value judgment" of the state. *Id.*

Plaintiff states that Section 2 of Amendment 68 could become operative by the passage of enabling legislation if *Roe v. Wade* were overruled. Since *Roe v. Wade* was explicitly reaffirmed by the Supreme Court in *Planned Parenthood of Southeastern Pennsylvania v. Casey,* —— U.S. ——, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) ("The doctrine of *stare decisis* requires reaffirmance of *Roe v. Wade*'s essential holding recognizing a woman's right to choose an abortion before fetal viability"), the question of passing enabling legislation for Section 2 is obviously moot.

There is no issue of confusion regarding what defendants must do or refrain from doing in the instant case: this Court enjoins the enforcement of Amendment 68 in its entirety and it enjoins the enforcement of provisions of the Arkansas state plan relating to abortion funding that are inconsistent with the 1994 Hyde Amendment for so long as Arkansas accepts federal money under the Medicaid Act. Plaintiffs have no adequate remedy at law. Monetary damages are inadequate and incapable of redressing the deprivation of rights wrought by Amendment 68.

## CONCLUSION

Arkansas Amendment 68 is inconsistent with the 1994 Hyde Amendment and therefore violates the Supremacy Clause. The Arkansas state plan insofar as it is inconsistent with the Hyde Amendment also violates the Supremacy Clause. The enforcement of Amendment 68 is hereby enjoined in its entirety for so long as the State of Arkansas accepts federal funds pursuant to the Medicaid Act. Likewise, the provisions of the Arkansas state plan that relate to abortion funding and are inconsistent with the Hyde Amendment are enjoined. Plaintiffs' motion for summary judgment is granted.

It is so ordered.

## *JUDGMENT*

Pursuant to the Order filed in this matter, summary judgment is hereby granted on behalf of plaintiff Little Rock Family Planning Services, et al. All matters in this case having been resolved, the case is dismissed with prejudice.

It is so ordered.

## *APPENDIX*

As mentioned in the text of the Court's Order, the Montana Court's opinion by Judge Jeffrey M. Sherlock in *Jeanette R., et al., v. State of Montana, Nancy Ellery, as Administrator of the Medicaid Services Division of the Montana Department of Social and Rehabilitation Services,* No. BDV–94–811, Montana First Judicial District Court, June 1, 1994, is hereby included as an appendix.

Montana First Judicial District Court
Lewis and Clark County

Cause No. BDV–94–811

Jeanette R., on behalf of herself and all others similarly situated; Susan Wicklund, M.D.; James H. Armstrong, M.D., on behalf of themselves and their Medicaid-eligible patients, Plaintiffs,

v.

State of Montana, Nancy Ellery, as Administrator of the Medicaid Services Division of the Montana Department of Social and Rehabilitation Services, in her individual and official capacities; Peter Blouke, as Director of the Montana Department of Social and Rehabilitation Services, in his individual and official capacities, and their successors, Defendants.

## ORDER

*The narrow question before this Court is whether the federal Medicaid laws,* Title XIX of the Social Security Act, 42 U.S.C. Section 1396, et seq., or Section 509 of the 1994 Appropriations Act *requires the Montana State Medicaid Program to pay for abortions in cases where pregnancy is a result of rape or incest.*

Although many may characterize this as strictly an abortion case, in reality, it is nothing more than a case of statutory and constitutional construction. The fact that the underlying subject is abortion raises a great deal of emotional consternation on all sides of the issue. This Court realizes that abortion is a very volatile issue in the country. Particularly is this the case when public funds are used for the abortion. Nonetheless, this Court's sole function is to read and enforce the law as it is written.

## FACTUAL BACKGROUND

The Court held a hearing on this matter on May 31, 1994. Testifying was Dr. Susan Wicklund, a Bozeman physician who provides abortion services. Dr. Wicklund is one of the Plaintiffs in this action. Dr. Wicklund indicates that 20 percent of her patients are eligible for Medicaid reimbursement. The

doctor indicated that once a woman has decided on an abortion, any delay is detrimental to the emotional and physical health of the patient. Further, Dr. Wicklund testified that many of her patients are forced to delay receiving an abortion because of a lack of funds. Dr. Wicklund stated that some of the delay attendant upon many abortions may be associated with the fact that a woman may not know that she is pregnant. Some delay also may be attributable to the decision-making process, and some may be attributable to the process of getting a woman transported from her home to Dr. Wicklund's office.

Dr. Wicklund testified that if she waived her fee for all Medicaid abortion patients, such a waiver would place a great financial burden on her clinic.

Another plaintiff in this action is Jeannette R. Jeannette became pregnant as a result of being raped by two men in March of 1994. She sought to have an abortion from Dr. Wicklund but was denied funding from Medicaid. Jeannette went ahead and had her abortion on May 26, 1994. She is apparently in desperate financial straits. She is a single mother who is struggling with paying her rent and going back to college to support herself and her child. Medicaid has thus far refused to pay for her abortion. If the fee is not waived, Jeannette will have to go without her educational plans or her rent payment.

The State presented no witnesses.

## LEGAL DISCUSSION

This particular dispute arises out of a conflict between Montana's administrative regulation concerning Medicaid payment and a statute passed by Congress.

ARM 46.12.2002(1)(e) provides as follows: "Physician services for abortion procedures must meet the following requirements in order to receive medicaid payment: The physician has found, and certified in writing, that on the basis of his/her professional judgment, the life of the mother would be endangered if the fetus were carried to term."

On the other hand, we have the federal law known as the Hyde Amendment. The 1994 Hyde Amendment became effective on October 21, 1993. This statute is also known as Pub.L. No. 103–112, § 509 (1993). It provides as follows: "None of the funds appropriated under this Act shall be expended for any abortion except when it is made known to federal entity or official to which funds are appropriated under this Act that such procedure is necessary to save the life of the mother *or that the pregnancy is the result of an act of rape or incest.*" (Emphasis added) The Hyde Amendment dates back to 1976. Each year since 1976, Congress has added some version of the Hyde Amendment to annual appropriations bills for the United States Department of Health and Human Services. From 1982 through 1993, the amendment limited federal funding of abortion to those cases when the life of the pregnant woman would be threatened by carrying the pregnancy to term. The current Hyde Amendment expands coverage to include pregnancies caused by rape or incest.

Defendants in this case have taken the position that they need not provide Medicaid funding for abortions that are the result of rape or incest. This Court disagrees.

First, the statute which enables the Montana Department of Social and Rehabilitation Services to enact administrative regulations, such as the one here in question (ARM 46.-12.2002) provides that the Department may: "make rules *consistent with federal and state law* establishing the amount, scope, and duration of services provided to recipients of public assistance." Section 53–2–201(2)(c), MCA. (Emphasis added) Clearly, Montana's administrative regulation is not consistent with the Hyde Amendment, which is the existing federal law on the subject.

At the hearing held at this matter, the Court was made aware of numerous federal decisions that have been rendered on this issue. Defendants' attorney was asked if he was aware of any state or federal decision to the contrary. No such case was provided to this Court.

*The federal decisions are basically to the effect that a state's Medicare funding program cannot be more restrictive than the Hyde Amendment.* A case almost identical to the present case is *Roe v. Casey,* 623 F.2d 829 (3rd Cir.1980). The *Roe* case dealt with

a Pennsylvania statute which prohibited Pennsylvania from making reimbursement for any abortion except where the abortion is certified in writing by a physician to be necessary to save the life of the mother. The Pennsylvania statute, thus, was nearly identical to the Montana administrative regulation here in dispute.

The version of the Hyde Amendment with which the *Roe* court was dealing was almost identical to the one with which we are here involved. At that time, the Hyde Amendment provided that no federal funds were to be used to perform abortions except where the life of the mother would be endangered or except for such medical procedures necessary for victims of rape or incest. *Roe* at 834. In striking down the Pennsylvania law, the Third Circuit held that the Hyde Amendment modified Title XIX of the Social Security Act to require states to fund, through Medicaid, abortions in two categories: where the life of the mother was endangered and where the pregnancy was a result of rape or incest. Since the Pennsylvania statutes were not consistent with the then existing Hyde Amendment, they could not stand. *Roe* at 836–37.

A similar result was reached in the recently decided case of *Hern v. Bye,* No. 93–N–2350, 1994 WL 192366 (D.Colo. May 12, 1994). In that case, the federal court struck down a portion of the Colorado Constitution and a portion of Colorado's statutes. Again, the Colorado provisions were narrower than the Hyde Amendment. The federal district court of Colorado struck down the Colorado provisions as being violative of the United States Constitution's Supremacy Clause which provides: "The Constitution, and *the laws of the United States* which shall be made in pursuance thereof; ... *shall be the supreme law of the land;* and the judges of every State shall be bound thereby, any thing in the Constitution or laws of any State to the contrary notwithstanding." Constitution of the United States, Article VI(2).[1] (Emphasis added)

The result reached by this Court was clearly within the contemplation of anti-abortion forces in the United States Congress. In testifying on the present provision of the Hyde Amendment, Senator Orin Hatch stated: "If federal funding of abortion is mandated through Medicaid, every state will be required to provide matching funds for abortion on demand." 139 Cong.Rec. 12,581 (September 28, 1993). Further, Senator Don Nickles asserted: "If we have this as a federal government policy for the federal government to pay for abortion, the states likewise have to match those funds ... there are no state options. The states have to match the federal funds." 139 Cong.Rec. 12,588 (September 28, 1993).

Clearly, Congress contemplated the very result being advocated by Plaintiffs in this action.

Further, evidence of the federal intent in this regard are Exhibits D, E, and F attached to Plaintiffs' complaint. Those documents are letters from the Health Care Financing Administration arm of the Department of Health and Human Services, dated December 28, 1993, January 5, 1994, and March 25, 1994. These letters evidence a clear federal intent that the Hyde Amendment requires state Medicaid programs to fund abortions caused by rape or incest.

The Montana Administrative Regulation is in violation of its own enabling statute, Section 53–2–201(2)(c), MCA, and with the Supremacy Clause of the United States Constitution. As such, it cannot stand.

It should be noted that at the hearing of this matter, Plaintiffs provided the professional medical testimony of two licensed physicians in the state of Montana. Both indicated that any delay in obtaining an abortion when one had been decided upon by a woman was detrimental to the woman's emotional and physical health. Thus, the Court has uncontradicted professional testimony that any delay in implementation of this order could cause serious and/or irreparable injury to Medicaid eligible women who are pregnant as a result of rape or incest. That, coupled

---

1. It should here be noted that on May 31, 1994, the United States Court of Appeals from the Tenth Circuit refused to stay the district court's judgment permanently enjoining enforcement of the Colorado constitutional and statutory provisions in question.

with the Court's conclusion that Plaintiffs have a good chance of succeeding on the merits of the case, gives rise to the conclusion of this Court that the state of Montana should be enjoined during the pendency of this action from restricting Medicaid reimbursement for abortions in a manner that is inconsistent with Pub.L. No. 103–112, § 509 (1993) (the 1994 Hyde Amendment).

The State has suggested, in its brief filed with the Court, that if this Court reaches the conclusion it has, that the State should still be allowed to determine whether abortion in any specific case is medically necessary as defined by state regulations. This Court is in no way changing or altering existing state regulations or statutes that deal with the medical necessity of abortions in any particular case. Rather, this Court is merely stating that the state of Montana cannot have a Medicaid reimbursement formula that is more restrictive than the formula provided by the federal government.

In conclusion, this Court needs to remind all parties concerned that any decision in a case like this is fraught with emotion and turmoil. This Court's function is to follow the law of this state and of the United States, regardless of whether this is an abortion case or a case involving some less controversial subject. If the state of Montana does not wish to follow the federal mandate concerning Medicaid funding of abortion, it need not accept federal Medicaid funds. If Montana uses federal Medicaid funds, it must follow the federal law.

Based on the above, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that Defendants are hereby enjoined, during the pendency of this action, from enforcing ARM 46.12.2002(1)(e) in a manner inconsistent with the 1994 Hyde Amendment, Pub.L. No. 103–112, § 509 (1993).

DATED this 1 day of June, 1994.

(s) Jeffrey M. Sherlock
DISTRICT COURT JUDGE