# The UNBORN CHILD AMENDMENT COMMITTEE, et al. *v.* Dr. Harry WARD, et al.

93-1149 943 S.W.2d 591

Supreme Court of Arkansas
Opinion delivered May 5, 1997

*Rutherford Institute of Arkansas, Inc.*, by: *Lavenski R. Smith* and *David G. Nixon*, for appellants.

*Fred H. Harrison*, General Counsel, University of Arkansas, and *Winston Bryant*, Att'y Gen., by: *Jeffrey A. Bell*, Deputy Att'y Gen., for appellees.

ANNABELLE CLINTON IMBER, Justice. Amendment 68 to the Arkansas Constitution prohibits the use of public funds to pay for abortions, except to save the mother's life. The appellants allege that the performance of abortions at UAMS, other than for the purpose of saving the mother's life, violates Amendment 68. The chancery court enjoined UAMS from performing abortions, other than those to save the mother's life, unless the patient paid for the abortion in advance, or furnished sufficient guarantee of payment by a third-party provider. We affirm.

In the 1988 general election, the Arkansas electorate adopted Amendment 68 to the Arkansas Constitution by a vote of 398,107 for and 368,117 against. In its entirety, the amendment provides as follows:

§ 1. Public funding.

No public funds will be used to pay for any abortion, except to save the mother's life.

§ 2. Public policy.

The policy of Arkansas is to protect the life of every unborn child from conception until birth, to the extent permitted by the Federal Constitution.

§ 3. Effect of amendment.

This amendment will not affect contraceptives or require an appropriation of public funds.

On August 8, 1991, the Unborn Child Amendment Committee, Jerry Cox, the Family Council, Larry Page, and the Christian Civic Foundation filed a complaint in Pulaski County chancery court seeking declaratory relief against the University of Arkansas for Medical Sciences. The Committee alleged that abortions were performed at UAMS, some of which were not for the purpose of saving the mother's life, in violation of Amendment 68. The complaint specifically alleged that these abortions were in violation of Sections 1 and 2 of Amendment 68, and stated that such abortions constituted an illegal exaction. Among other things, the Committee requested that the chancellor declare as "public funds" all funds received or expended by UAMS, a declaration that all abortions performed at UAMS necessarily involve the expenditure of "public funds," and a declaration that all abortions performed at UAMS not necessary to save the life of the mother were in violation of Sections 1 and 2 of Amendment 68. The Committee also sought injunctive relief against UAMS prohibiting all abortions except those to save the mother's life.

In July of 1991, the chancellor entered a preliminary injunction that prohibited UAMS from performing abortions other than those to save the mother's life, unless the patient paid in advance for the cost of the abortion, or furnished sufficient guarantee of payment by a third-party provider. The case was eventually consolidated with two substantially similar cases against UAMS, brought by plaintiffs Ralph Forbes and Melissa Knowlton.[1] Both the Committee and UAMS moved for summary judgment. After a hearing on the matter, the chancellor rendered her order on June 30, 1993, which denied both motions for summary judgment, but issued an order and permanent injunction that substantially reflected the preliminary injunction.

The chancellor found that funds appropriated to UAMS, as well as revenues received from patients, were "public funds" as that term was used in Amendment 68. Accordingly, UAMS's use of funds from full-paying patients to cover the cost of abortions for those patients who did not pay in full was prohibited by the

[1] Knowlton's appeal was disposed of in *Knowlton v. Ward*, 318 Ark. 867, 889 S.W.2d 721 (1994).

amendment. However, the chancellor ruled that the amendment did not prohibit the performance of abortions at public facilities or by public employees, nor did it prohibit UAMS from performing abortions for patients who either paid for their abortions or who secured payment from a third-party provider. Accordingly, the chancellor enjoined UAMS from performing abortions, other than those to save the life of the mother, unless the patient paid for the cost of the abortion in advance or sufficiently guaranteed payment by a third-party provider. UAMS was also directed to take all steps reasonably necessary to ensure that all those paying for abortions do in fact pay for the direct and indirect costs of the abortion procedure. To that end, the trial court ordered UAMS to maintain cost figures based on all usual and customary calculations that would be made by a prudent individual making such a cost assessment. The trial court also declined to hold that Amendment 68, section 2, was anything more than a statement of public policy which was not a self-executing provision. On June 30, 1993, the Committee filed its notice of appeal from this order and permanent injunction.

Subsequently, a lawsuit was filed challenging Amendment 68 in the United States District Court, Eastern District of Arkansas, Little Rock Division, styled *Little Rock Family Planning Servs., P.A. v. Dalton*, No. LR–C–93–803. At issue in that case was whether Amendment 68 conflicted with the fiscal-year 1994 version of the Hyde Amendment, The Department of Labor, Health & Human Services, & Education, & Related Agencies Appropriations Act of 1994, § 509, Pub. L. No. 103-112, 107 Stat. 1082, 1113 (1993). This version of the Hyde Amendment amended Title XIX of the Social Security Act of 1965 (commonly referred to as the Medicaid program) to prohibit federal reimbursements to participating states for an abortion unless "such procedure is necessary to save the life of the mother or that the pregnancy is the result of an act of rape or incest." *Id.*

On July 25, 1994, the district court held that under the Supremacy Clause, the Hyde Amendment preempted Amendment 68. *Little Rock Family Planning Servs., P.A. v. Dalton*, 860 F. Supp. 609 (E.D. Ark. 1994). While recognizing that states were not constitutionally required to pay for abortions, compliance

with the Hyde Amendment (and hence eligibility for federal Medicaid funding), required that Amendment 68 establish two additional classes of funding for rape and incest victims. The district court reasoned that it was powerless to rewrite Amendment 68, and thus concluded that "the Amendment must be stricken in its entirety, to enable the people or their elected representatives to decide how Arkansas will cover abortion in the state Medicaid program so that it will not conflict with federal law." *Id.*

UAMS then moved to stay the proceedings in the present case pending the disposition of the appeal in the federal case. This court denied the motion, and the present case was submitted and argued orally on September 19, 1994. However, we reconsidered the motion and opted to stay further proceedings, in addition to staying the order and permanent injunction ordered by the trial court. *Unborn Child Amendment Comm. v. Ward*, 318 Ark. 165, 883 S.W.2d 817 (1994).

On July 25, 1995, the Court of Appeals for the Eighth Circuit affirmed the district court. *Little Rock Family Planning Servs., P.A. v. Dalton*, 60 F.3d 497 (8th Cir. 1995). The United States Supreme Court granted certiorari in part, and reversed the Eighth Circuit. *Dalton v. Little Rock Family Planning Servs., P.A.*, 116 S. Ct. 1063 (1996) (per curiam). The Court held that the district court's order striking Amendment 68 in its entirety was overbroad. Because the challenge to Amendment 68 only involved its conflict with Title XIX, "it was improper to enjoin its application to funding that does not involve the Medicaid program." *Id.* Furthermore, the Court emphasized that the Hyde Amendment was not permanent legislation, but instead part of the appropriation statute for certain executive departments in a given fiscal year. Because there had been different versions of the Hyde Amendment in the past, the temporal scope of the district court's order was overbroad, given that a different version of the Hyde Amendment might be enacted in the future. Finally, to the extent that Section 1 of Amendment 68 had substantial application allowed under the Supremacy Clause, Sections 2 and 3 of the amendment were viable as well. In sum, the Supreme Court reversed the Eighth Circuit decision affirming the scope of the injunction, and remanded for the entry of an order enjoining Amendment 68 only

to the extent that it conflicted with federal law. On August 9, 1996, the district court entered an order providing that "Arkansas Amendment 68 is. . . null and void, and its enforcement enjoined, to the extent it prohibits the use of state funds to pay for abortions for Medicaid eligible victims of rape or incest, for so long as the federal law mandates Medicaid funding for abortions for Medicaid eligible victims of rape or incest."

■ On January 27, 1997, the Committee moved this court to release the stay on the proceedings, arguing that the federal case was now concluded rendering the present appeal ripe for adjudication; UAMS likewise joined in this request. We agree and now reach the merits of the Committee's appeal. However, we must first take note of the United States Supreme Court's holding in *Dalton, supra.* Whatever construction we now give to Amendment 68, with regard to Medicaid patients in situations involving rape or incest, the amendment must give way to the Hyde Amendment to Title XIX so long as Arkansas participates in the Medicaid program, and the current version of the Hyde Amendment remains in effect. *Dalton, supra.*

### 1. Appellate Jurisdiction.

■ The Committee first purports to appeal from the chancellor's denial of its motion for summary judgment. It is well settled that this court does not review the denial of a motion for summary judgment. *Pugh v. Griggs,* 327 Ark. 577, 940 S.W.2d 445 (1997); *Ball v. Foehner,* 326 Ark. 409, 931 S.W.2d 142 (1996); *Nucor Holding Corp. v. Rinkines,* 326 Ark. 217, 931 S.W.2d 426 (1996). However, we nonetheless reach the merits of the Committee's case as an appeal from the trial court's order and permanent injunction.

### 2. The Committee's Challenges Under Amendment 68.

On appeal, the Committee brings a number of challenges to the chancellor's order and permanent injunction. All of these points relate to the plain language of Amendment 68, Section 1, and whether "public funds" are being used to "pay for" abortions. The Committee's broadest argument is that Amendment 68 con-

stitutes a *per se* bar to the use of any public facilities or public employees to perform an abortion. Thus, when these facilities and employees are either directly or indirectly used in the performance of an abortion, public funds are being used to pay for the cost of an abortion. The Committee contends alternatively that if Amendment 68 does not constitute a *per se* bar, then the chancellor's order and injunction, which allows a patient to pay in advance or to furnish guarantee of payment by a third-party provider violates Amendment 68 because UAMS cannot determine the cost of an abortion. Additionally, a patient may pay in advance and then incur additional costs in the abortion procedure that were not calculated in the original charge. If the patient cannot pay the additional cost, the Committee maintains that the state is using public funds to pay for the cost of an abortion. The Committee also argues that even if a third-party provider guarantees later payment, the state is effectively financing the cost of an abortion in the interim. Finally, the Committee bolsters its arguments with Section 2 of the amendment, its statement of public policy. The Committee asserts that the level of state involvement in abortions allowed under the trial court's order and injunction is in violation of the amendment's express statement of public policy.

### a. Amendment 68, Section 2 — Public Policy.

We initially address the Committee's reliance on Section 2 of the amendment. In *Knowlton v. Ward*, 318 Ark. 867, 889 S.W.2d 721 (1994), we held that Section 2 was indeed a mere expression of Arkansas's public policy. There we said that Section 2 "does not provide any means by which the policy is to be effectuated and therefore cannot be considered a self-executing provision." *Id.* Accordingly, we decline to construe Section 2 as prohibiting the injunction imposed by the chancellor on UAMS.

### b. Amendment 68, Section 1 — Per Se Violation Analysis.

We next consider the Committee's contention that the performance of abortions at UAMS is a *per se* violation of Amendment 68. The Committee agrees with the trial court's finding that "[t]he term 'public funds' as used in Amendment 68, Section 1 of the Constitution does not refer to tax revenues, but rather to

any public monies belonging to the State." Such a construction of "public funds" is consistent with our prior cases. *See Sebastian County Chapter v. Weatherford*, 311 Ark. 656, 846 S.W.2d 641 (1993) (giving term "public funds" as used in FOIA its plain and ordinary meaning - "moneys belonging to government."). The Committee nonetheless argues that the chancellor's order and injunction — permitting abortions where the individual pays in advance or furnishes guarantee of payment by a third-party provider — is an erroneous interpretation of Amendment 68's prohibition of the use of public funds to pay for any abortion except to save the mother's life.

 In examining the language contained in Amendment 68, Section 1, we have stated as follows:

> Section 1 of Amendment 68 proscribes the use of public funds to "pay for any abortion." In construing the meaning of this provision we apply the same rules governing the construction of legislative statutes. *Gazaway v. Greene County Equalization Board*, 314 Ark. 569, 864 S.W.2d 233 (1993); *Faubus v. Kinney*, 239 Ark. 443, 389 S.W.2d 887 (1965). The fundamental rule is that the words of the constitution or statute should ordinarily be given their obvious and natural meaning. *Gipson v. Maner*, 225 Ark. 976, 287 S.W.2d 467 (1956). If the language used in a constitutional provision is plain and unambiguous, the court should not seek other aides of interpretation in determining the intent of the framers and voters. *Ellison v. Oliver*, 147 Ark. 252, 227 S.W. 586 (1921).

*Knowlton v. Ward*, 318 Ark. 867, 889 S.W.2d 721 (1994). In *Knowlton, supra*, this court further explained that "[i]t hardly seems possible that any other language could be used to explain more plainly or unambiguously the purpose or meaning of the phrase, 'to pay for any abortion.'" Accordingly, for any entity to be in violation of Amendment 68, Section 1, the challenging party must provide the following proof:

> 1. That abortions were performed at the entity that were paid for with public funds; or

> 2. That the entity paid for, with public funds, abortions that were performed elsewhere.

*Knowlton, supra.*

*Knowlton* provides an illustration of how this standard works. As stated above, *Knowlton* was actually a companion case to the present case. Knowlton initially sued both UAMS and the Arkansas Genetics Program, which was a part of UAMS. Knowlton specifically alleged that AGP provided abortions in violation of Amendment 68. UAMS moved for partial summary judgment and to dismiss AGP as a party, which the chancellor granted. The dismissal of AGP occurred prior to the consolidation of Knowlton's case with that of the Committee and Forbes.

The evidence revealed that AGP did not actually perform abortions, but that it provided medical care in support of individuals affected with various genetic disorders and birth defects, and that it informed families who have, or might have, pregnancies that are at risk of an adverse outcome. Knowlton argued that Amendment 68 not only prohibited the use of public funds to pay for the performance of abortions, but that "it also prohibits the use of public funds to pay for *any activity* that might further or advance the performance of abortions." *Knowlton, supra* (emphasis in original). This court concluded that Section 1 was plain and unambiguous, and that Knowlton had simply failed to offer proof to support her case under the section. We stated that "[t]he plain and unambiguous meaning of [Section 1] does not prohibit the 'testing, diagnosis, and counseling to families during the preconceptional, prenatal and postnatal periods' that is performed by AGP." *Knowlton, supra.*

Similarly, in *Juvenile H. v. Crabtree*, 310 Ark. 208, 833 S.W.2d 766 (1992) (per curiam), the petitioner was involved in a juvenile proceeding where she was placed in the custody of DHS because she was in substantial risk of serious harm. The trial court ruled that the juvenile could not terminate her pregnancy without an order of the court relying in part on Amendment 68:

> Amendment 68 also prohibits the use of public funds for an abortion. The State of Arkansas has already, and will continue expending public funds for the care of the minor during pregnancy and would indirectly or directly expend funds for the care

of the minor child while in custody of the state after termination of the pregnancy in violation of Amendment 68.

*Id.*

On petition for writ of certiorari to this court, we vacated the portion of the juvenile judge's order enjoining the juvenile or her attending physicians from terminating her pregnancy. In doing so, we dismissed the trial court's reliance on Amendment 68 as irrelevant, because the juvenile had failed to request public funds.

■ As is apparent from *Knowlton, supra,* and *Crabtree, supra,* Amendment 68, Section 1 does not prohibit the use of public funds to pay for any activity that might further or advance the performance of abortions. Instead, it prohibits the use of public funds to "pay for" abortions, except where necessary to save the life of the mother. BLACK'S LAW DICTIONARY, 6th ed. (1990), defines the verb "pay" in part as "[t]o compensate for goods, services or labor." WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY (1991) defines "pay" as "to make due return to for services rendered," or "to give in return for goods or service." Thus, the phrase "pay for" plainly implicates an exchange in return for services. Under the Committee's theory, the salaries of UAMS employees, the public funds used to construct and maintain UAMS buildings, and the monies used to purchase medical supplies are all being used to pay for abortions when abortions are allowed to take place at UAMS. This broad construction of Section 1 is far beyond the scope of the plain meaning of the word "pay."

■ We have already held that Amendment 68 does not prohibit the use of public funds to pay for *any activity* that might further or advance the performance of abortions. *See Knowlton, supra; Crabtree, supra.* The Committee's assertion that Amendment 68 generally prohibits the use of public buildings or the use of publicly paid employees to perform abortions ignores the plain language of Amendment 68. The use of public funds must go to "pay for" an abortion in order for the prohibition to apply. Amendment 68 does not prohibit the use of things paid for by public funds, but it does plainly prohibit payment for abortions with public funds.

This conclusion is supported by an examination of laws in other jurisdictions that have expressly prohibited not only the use of public funds to pay for abortions, but also the use of public buildings or public employees to perform abortions. For example, UAMS cites *Webster v. Reproductive Health Servs.*, 492 U.S. 490 (1989), where the United States Supreme Court upheld Missouri statutes limiting public resources that could be used to perform abortions. The Missouri statutes upheld in *Webster* expressly prohibited a public employee from performing or assisting with an abortion, except to save the mother's life. Similarly, the law expressly prohibited the use of a public building to perform an abortion, and the use of "public funds, employees, or facilities for the purpose of 'encouraging or counseling' a woman to have an abortion except to save her life." The Court ultimately reasoned that:

> Having held that the State's refusal to fund abortions does not violate *Roe v. Wade*, it strains logic to reach a contrary result for the use of public facilities and employees. If the State may "make a value judgment favoring childbirth over abortion and . . . implement that judgment by the allocation of public funds," (citation omitted), surely it may do so through the allocation of *other* public resources, such as hospitals and medical staff.

*Id.* (emphasis added). Thus, the *Webster* Court recognized how the Missouri statutes encompassed different public resources. Not only did they permissibly prohibit public funding, but they also prohibited the use of public facilities and public employees.

By its plain language, the Missouri prohibition considered in *Webster* appears broader than the one found in Amendment 68. Similarly, other states have seen fit to place broad limits on the amount of public resources that may be expended with regard to abortions. For example, La. Rev. Stat. Ann. § 1299.34.5 (enjoined from enforcement insofar as it conflicts with Hyde Amendment to Title XIX, *Hope Medical Group v. Edwards*, 860 F. Supp. 1149 (E.D. La. 1994)), provides in part that:

> [N]o public funds, made available to any institution, board, commission, department, agency, official, or employee of the state of Louisiana. . . whether such funds are made available by [any government subdivision], or from any other public source

shall be used *in any way for, to assist in, or to provide facilities* for an abortion, except when the abortion is medically necessary to save the mother's life.

(Emphasis added.) The prohibition found in Amendment 68, Section 1 appears more narrow than the one contained in the Louisiana statute. *Compare* Ky. Rev. Stat. Ann. § 311.715 ("no public funds shall be used for the purpose of obtaining an abortion") and N.D. Cent. Code § 14-02.3-01 ("no funds of this state. . . may be used to pay for the performance, or for promoting the performance, of an abortion") *with* Ky. Rev. Stat. Ann. §311.800(1) ("no publicly owned hospital. . . shall perform or permit the performance of abortions") and N.D. Cent. Code § 14-02.3-04 ("no person may authorize or perform an abortion in a hospital owned, maintained, or operated within the state by the state"); *see also* Ariz. Rev. Stat. Ann. § 35-196.02 ("no public funds. . . may be expended for payment to any person or entity for the performance of any abortion. . . ."); Colo. Const. Art. V., § 50 ("No public funds shall be used. . . to pay or otherwise reimburse, either directly or indirectly, any person, agency or facility for the performance of. . . [an] abortion"); Ohio Rev. Code Ann. § 5101.55(C) ("public funds shall not be used to subsidize an abortion"); Pa. Stat. Ann. tit. 62, § 453 ("no [public] funds. . . shall be expended by any State or local government agency for the performance of abortion."); S.D. Codified Laws Ann. § 28-6-4.5 ("No funds of the state. . . shall be authorized or paid to or on behalf of any person or entity for or in connection with any abortion. . . .").

■ Giving the phrase "pay for" its plain and ordinary meaning — compensation for a service — we reject the Committee's argument that Amendment 68 erects a *per se* bar to abortions performed at UAMS other than those to save the life of the mother, where patients pay for the cost in advance or furnish guarantee of payment by a third-party provider. Simply put, if a patient or third-party provider pays for the cost of an abortion per the chancellor's order and permanent injunction, it cannot then be said that public funds are being used to pay for that abortion. Thus, there is no *per se* Amendment 68 violation when such an abortion is performed in a public hospital or by a public employee.

Therefore, we affirm the chancellor's ruling that Amendment 68 does not prohibit the performance of abortions at public facilities and by public employees, and does not prohibit UAMS from performing abortions for patients who either paid for their abortions or secured payment from a third-party provider.

c. *Amendment 68, Section 1 — As Applied Violation Analysis.*

The Committee further contends that UAMS cannot determine the cost of an abortion, thereby preventing UAMS from accurately charging patients for the cost of the procedure. A corollary of this argument is that the state will effectively finance abortions in violation of Amendment 68 when actual charges remain unpaid by patients, or in the interim period where payment of charges is guaranteed by a third party. The Committee, as the challenger in this case, bears the burden of proving that UAMS cannot determine the cost of an abortion, or that the amount UAMS charged does not cover the actual cost of the procedure.

Dr. Harry Ward, the chancellor of UAMS and a named defendant-appellee, testified that a separate line for indigent care in the appropriations bill for UAMS would not be used for the OB-GYN service because it was a self-supporting service. Likewise, there were no staff-members in the OB-GYN department who were there specifically to perform abortions. According to Dr. Ward, "if this [abortion] program was closed tomorrow, there would be no change of staff or anything." Physician's salaries are calculated from a figure initially recommended by the dean of the College of Medicine, and are paid in part by the state and in part by the cash funds generated through the Medical College Physicians Group (MCPG). Likewise, there was no equipment specifically designated for use in abortions at UAMS. In other words, the equipment used for abortions was also used throughout the entire OB-GYN program.

Regarding billing for services at UAMS, Dr. Ward explained that patients received two bills. One was from the hospital, and the other was from the physician. The physician's bill was prepared by and paid into the MCPG. In his deposition, Howard

Rutenberg stated that various overhead and indirect factors were considered in arriving at the amount that the hospital charged for its services. Factors such as the cost of acquiring and servicing equipment, and the cost of supply items used in association with the equipment, and the costs of manpower were all figured in. When asked how UAMS charges compared with comparable charges in the community, Rutenberg answered that UAMS charges were generally higher, because UAMS was a teaching facility and as such had to cover education costs not existing at other hospitals. David Heron stated that the hospital covered its direct costs "and then some." In fact, the UAMS campus needed the additional revenue to function, because the hospital generated 65 to 70 percent of the total revenue for the campus.

Dr. Ward testified that UAMS, as well as all other hospitals, used an accounting system known as "cost–transfer" in determining the amount a patient is charged. When certain patients do not pay their bill in full, the deficit is made up by patients who are paying their full charges. Dr. Ward further testified that about sixty percent of patients in the abortion program fully paid, and that these full-paying patients provided UAMS with enough revenue to cover those patients who did not pay in full.[2]

Richard Jones, the director of finance at University Hospital, testified that a number of costs incurred in running the hospital were not allocated directly to the hospital's budget. However, a cost report required by the Health Care Financing Administration was nonetheless prepared to provide a methodology for allocating those indirect costs to the hospital in order to justify reimbursement under the Medicare program. Jones said that he was not aware of any study done at UAMS to determine the cost of an abortion. Moreover, he testified that charges for some services may not cover the cost of those services, whereas charges for other

---

[2] Ward testified to a "sliding-scale" method of billing based on the evaluation of each patient's financial situation:

> And like all hospitals, we have a sliding scale that's based on their income and their number of members in the family, and then their bill represents a certain percentage of the overall bill. And a sliding scale could go all the way down to zero. I don't know how many paid fifty percent of their bill, or seventy-five percent of their bill, or zero of their bill.

services may exceed their cost. However, he also testified that "when we establish our prices, we establish our prices for all items in total to cover our costs." Dr. Ward testified that on the physician side of billing, the amount charged for a procedure was figured on a number of different bases, one of which was the "reasonable and customary charges that are approved charges through. . . insurance companies, through. . . third-party payers." Howard Rutenberg testified that on the hospital side of billing, "We try to cover all of those costs [direct and indirect] in pricing our service." With regard to the specific charge a patient was billed for an abortion, Dr. Ward testified that the hospital fees were usually somewhere between $1,500 and $2,000.[3]

We agree with the Committee that to the extent UAMS incurs actual costs in performing an abortion, and these costs go uncharged and unpaid, public funds are being used to pay for abortions. This conclusion is reflected in the trial court's holding that UAMS's method of cost transfer, where revenues from full-pay patients were used to cover the costs of those who did not make full payment, violated Amendment 68. However, in light of the above-recited evidence, it is plain that the Committee failed to meet its burden to prove that UAMS could not accurately determine the cost of an abortion. Rather, the weight of the evidence suggests that UAMS attempted to cover all of its direct and indirect costs in arriving at a charge for a procedure, both on the hospital and physician side of billing. In fact, it appears that the charges billed by UAMS far exceed costs, since full-pay patients cover the costs of those patients who do not pay. Moreover, the trial court ordered UAMS to "take all steps reasonably necessary" to guarantee that patients pay for their abortions, and that it maintain "appropriate cost figures to ensure that amounts charged to patients cover the direct and indirect costs of an abortion, such cost figures to be a reasonable assessment based on all usual and customary calculations that would be made by a prudent individual making such cost assessment regarding the costs of any procedure to be performed in a hospital." Thus, to the extent that

---

[3] Later evidence suggests that the typical charge for an abortion was in the $4,000 range.

UAMS may not have included all of its direct and indirect costs in calculating their charge to a particular patient in the past, they *must* do so now under the express terms of the trial court's order and injunction. We cannot say that the trial court erred in finding that the direct and indirect costs of an abortion could be reasonably calculated, and ordering UAMS to take all steps reasonably necessary to ensure that its charge does in fact cover those calculated costs.

The Committee next argues that under the chancellor's order and injunction, the state will effectively finance abortions when actual charges go unpaid, or in the interim period where payment of charges is guaranteed by a third party. Although there is practically no empirical accounting or billing data in the record, the Committee highlights a letter from the office of the general counsel of the University of Arkansas detailing abortions performed at UAMS since the preliminary injunction (and thus under the court-ordered payment system) through June 1, 1992. The letter shows that during this time period, the hospital's initial charge, inclusive of physician services, was $2,500, even though it was later raised to $4,000. This data shows that ten abortions were performed, three being self-pay, and the rest paid either through Medicaid or Blue Cross/Blue Shield, or through some form of commercial insurance. Of the three self-pay abortions, only one patient had paid her balance in full. One self-pay patient reflected an outstanding balance of $721.05, and the other showed an outstanding balance of $4,484.55. Similarly, three of the patients covered by a third party showed an outstanding balance for their procedures.

Again, we note that to the extent that actual costs of the abortion procedure, either direct or indirect, go unpaid by the patient or third-party provider, there is a violation of Amendment 68. That being said, we note that the Committee failed to obtain a specific ruling from the trial court whether UAMS had in fact violated the preliminary injunction. The evidence that is contained in the letter, that *charges* have gone unpaid, is not necessarily dispositive of the issue of whether those patients paid for the *costs* of their procedure. The charges in those cases may have in fact exceeded the cost of the procedure. On the record before us,

these facts are simply unknown. Thus, to the extent that there might be evidence suggesting that actual charges have gone unpaid in the past, we decline to reverse the chancellor's order and injunction on that ground.

Affirmed.

BROWN and THORNTON, JJ., not participating.

Special Justice JoANN C. MAXEY joins in the opinion.